**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Echols*, Slip Opinion No. 2024-Ohio-5088.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5088

THE STATE OF OHIO, APPELLEE, *v*. ECHOLS, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Echols*, Slip Opinion No. 2024-Ohio-5088.]**

*Criminal law—Other-acts evidence—Witness intimidation—Evidence of witness intimidation must be properly analyzed under Evid.R. 404(B) when offered as proof of an "other crime, wrong, or act"—Witness-intimidation evidence relevant for a nonpropensity purpose must still be subjected to Evid.R. 403(A) balancing to determine whether its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues, or misleading jury—Judgment affirmed.*

(No. 2023-1024—Submitted April 9, 2024—Decided October 25, 2024.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-220133, 2023-Ohio-2206.

_____

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DONNELLY, STEWART, BRUNNER, and ROBB, JJ., joined. CAROL ANN ROBB, J., of the Seventh District Court of Appeals, sitting for DETERS, J.

**DEWINE, J.**

{¶ 1} Two men opened fire on a room full of people, killing one and wounding eight others. James Echols was identified as one of the shooters and arrested. While in jail awaiting trial, he allegedly threatened the State's principal witness—the man who had hired him to carry out the shooting, and he also wrote a letter in which he suggested, among other things, that harm be done to the witness's wife. The trial court admitted evidence of those acts at Echols's trial along with other evidence of Echols's participation in the underlying crime. Echols was convicted, and the First District Court of Appeals affirmed his conviction, finding that the witness-intimidation evidence had been properly admitted to show Echols's consciousness of guilt.

{¶ 2} In this appeal, Echols challenges the admission of this evidence. He argues that the trial court should have analyzed the evidence as "other acts" evidence under Evid.R. 404(B) and followed the analytical framework for such evidence that this court outlined in *State v. Hartman*, 2020-Ohio-4440. We agree that the witness-intimidation evidence at issue here constitutes other-acts evidence—it is evidence "of any other crime, wrong, or act," Evid.R. 404(B)(1). But we find no error in the admission of this evidence. It was properly admitted for a purpose other than showing Echols's character; it showed Echols's consciousness of his guilt. *See* Evid.R. 404(B)(2). And the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury," Evid.R. 403(A).

2

## I. Background

{¶ 3} As a result of the shootings, Echols was charged with various counts of murder, attempted murder, and other crimes. He was tried together with Micheal Sanon, the other alleged shooter. The following account is based on the evidence presented at trial. We focus primarily on the evidence that is relevant to Echols's appeal to this court.

### A. The 2017 Shooting

{¶ 4} In the summer of 2017, Cheyanne Willis was hosting a party at her home when two men burst into her crowded living room and opened fire. The shooters fired 13 times before they fled. Eight people were injured, including a two-year-old and a three-year-old. And one person was killed. Police commenced a months-long investigation, but the story only started to emerge when officers began speaking to Roshawn Bishop. Although his story changed over the course of his six interviews with investigators, Bishop eventually identified James Echols as one of the two shooters. Investigators corroborated key portions of Bishop's account of the shooting with cellphone GPS data, text messages, and information from social-media accounts.

{¶ 5} According to testimony adduced at trial, the chain of events leading to the attack at Willis's home began a month earlier when Bishop borrowed $10,000 from Willis with the understanding that he would repay her the money within 30 days. Bishop was a drug dealer, and he used the money to fund his drug operation. Willis needed the money back because it belonged to her boyfriend's grandmother. And when Bishop didn't pay Willis back, she persistently reached out to him.

{¶ 6} Rather than repay Willis, Bishop and his partner in the drug operation, Robert Howard, crafted a plan to scare her out of further attempts to collect the money. Bishop contacted his cousin in Columbus, Vandell Slade, to help execute the plan. Slade brought Echols with him from Columbus, and Sanon later joined them. On the night of the shooting, Slade drove Sanon and Echols to Willis's

house. Sanon and Echols walked into the house and opened fire. Afterwards, Bishop and Howard paid Echols $1,500 and helped burn the assailants' clothes.

{¶ 7} Bishop was eventually arrested for drug trafficking. While released on bond, he approached the police about cooperating in ongoing investigations, and ultimately, he told them that he had information about the shooting at Willis's home. Bishop testified that he was "nervous and scared" to speak to the police. By his account, he had been threatened and assaulted while in jail because of his cooperation with law enforcement. Nonetheless, Bishop at some point identified Echols and Sanon as the shooters.

### B. The Evidence of Witness Intimidation

{¶ 8} In addition to evidence about Echols's participation in the shootings, the State introduced at trial evidence of three instances in which he had attempted to intimidate witnesses to the crime. First, while Echols and Bishop were incarcerated in the same facility, Bishop saw a message on the wall of the jailhouse holding cell that read, "Roshawn Bishop is a rat," and indicated that there was a $30,000 bounty on Bishop's head. The graffiti was signed with Echols's nickname, "Wopp." Second, on the same day Bishop saw the graffiti, Echols encountered Bishop in the jail and made "a gun gesture" toward him with his fingers. Bishop understood both the graffiti and the gesture as threats made on account of his status as a cooperating witness in this case.

{¶ 9} Third, the State introduced a three-page letter written by Echols while in jail. In April 2019, Echols mailed the letter to one "S. Parks" in Columbus. When the letter came back marked "return to sender," a clerk in the jail mailroom followed protocol and opened it. In the letter, Echols asked the intended recipient to "get like 4 or 5 people" to say that they saw him at "the Rise" at the time of the shooting and that he was wearing "all white." Echols included suggestions of people to enlist to create a false alibi for him and gave detailed instructions as to what each should say Echols had been doing and wearing at the time. Elsewhere

4

in the letter, Echols noted that Bishop and his wife, Deborah Bishop, were supposed to take the stand against him. He referred to Deborah as "that bitch Debbie 'Roshawn's wife,' " and stated "she gotta go ASAP," noting that this "might make her husband recant his statement." On the last page of the letter, Echols listed the full names, birthdates, and Social Security numbers of "the victims who survived" and told his intended recipient to "see what you can do with this info."

{¶ 10} Echols filed a motion in limine requesting an order prohibiting the State from admitting the photograph of the threatening graffiti in the jailhouse holding cell. He challenged the relevance of the photograph, citing Evid.R. 401, and argued that it was more prejudicial than probative under Evid.R. 403. Finally, he noted that the "author of the drawing" was "unknown," and contended that the graffiti could not be authenticated by him or his codefendant, Sanon. Echols repeated these arguments during a hearing on the motion which was held on the morning that trial began.

{¶ 11} The trial court denied the motion, finding the evidence relevant. The court added that it would admit the evidence if Bishop testified, but it would exclude the evidence if he did not testify. At trial, Echols objected to the admission of the photograph based on the lack of proper foundation, arguing that Bishop could not "possibly know when that was created and who created it." The trial court overruled the objection and admitted the photograph.

{¶ 12} Echols also filed a motion in limine requesting an order prohibiting the State from admitting the last page of his letter, which contained victim-witnesses' names, birthdates, and Social Security numbers. Echols argued that none of the permissible uses of other-acts evidence enumerated in Evid.R. 404(B)(2)—"proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"—applied to the final page of the letter. Echols further argued that the last page of the letter was not relevant under Evid.R. 401, and was more prejudicial than probative under Evid.R. 403(A).

Following a hearing on the motion, the trial court stated that the letter would be admitted in full at trial, explaining that "the relevance outweighs any potential problems" with the last page. The court ultimately admitted the evidence at trial after redacting references to Echols's codefendant. Echols objected to the redactions but did not restate his prior objection that the last page of the letter was inadmissible under Evid.R. 404(B).

{¶ 13} At trial, the State also elicited testimony from Bishop about the gun gesture that Echols had made toward him. Echols did not object before or at trial to this testimony. The trial court did not provide a limiting instruction to the jury as to the permissible uses of the witness-intimidation evidence.

### C. Echols's Conviction and Appeal

{¶ 14} The jury found Echols guilty of aggravated burglary, aggravated murder, two counts of murder, eight counts of attempted murder, and nine counts of felonious assault, all with firearm specifications. Echols was sentenced to an aggregate term of life in prison with parole eligibility after 25 years.

{¶ 15} Echols appealed to the First District Court of Appeals. One of his arguments on appeal challenged the admission of the letter, the graffiti, and Bishop's testimony about the gun gesture. He argued that the letter and "Bishop's testimony concerning the 'gun' gesture and graffiti . . . certainly constituted evidence of 'other acts.' " Echols contended that "to the extent that any of the limited, enumerated purposes set forth in Evid.R. 404(B)—such as identity—were even at issue in this case, any evidence of purported witness intimidation that occurred after the shooting had already taken place shed no additional light on these issues." And he contended that rather than demonstrating a consciousness of guilt, the evidence "was only indicative that [Echols] was (quite understandably) incensed at Bishop for implicating him as a murder suspect."

{¶ 16} The court of appeals rejected Echols's arguments, noting that evidence of other crimes, wrongs, or acts can be admissible to show consciousness

of guilt. 2023-Ohio-2206, ¶ 28 (1st Dist.) (lead opinion). It found that "Echols's threats are evidence of his efforts to intimidate witnesses and reflect a consciousness of guilt." *Id.* at ¶ 31. And it observed that "[t]he threats were also relevant to explain why [Bishop] was initially reluctant to tell the truth and why his story changed over time." *Id.* The court of appeals concluded that the trial court did not abuse its discretion in admitting the evidence of witness intimidation, and accordingly overruled that assignment of error. *Id.* Notably, while the lead opinion referred to Evid.R. 404(B)—which governs the admission of "other acts" evidence—it did not engage in any analysis about the rule's application. *Id*. at ¶ 28.

{¶ 17} This omission spawned a separate concurrence and a partial dissent. The two other judges on the panel argued that Evid.R. 404(B) and the cases construing that rule should apply to the admission of witness-intimidation evidence.

{¶ 18} In his concurring opinion, Judge Bergeron agreed with the lead opinion's analysis affirming the admission of the witness-intimidation evidence in light of this court's precedent. 2023-Ohio-2206 ¶ 54 (1st Dist.) (Bergeron, J., concurring). However, he questioned whether the "admissibility result" would "differ under an Evid.R. 404(B) analysis." *Id*. Judge Bergeron advocated that witness-intimidation evidence be analyzed under Evid.R. 404(B), although, in his view, "[e]xtant Ohio authority largely fails to do this." *Id.* at ¶ 44. Instead, he concluded that Ohio courts treat such evidence as an "admission by conduct" and allow its admission "as a matter of course." *Id.* at ¶ 47, citing *State v. Hamm*, 2017-Ohio-5595, ¶ 20 (1st Dist.). He criticized Ohio courts' use of witness-intimidation evidence as being "[u]nderpinn[ed]" by a "false and outdated psychological assessment of criminal defendants." *Id.* at ¶ 48. Asking why a criminal defendant might intimidate a witness, Judge Bergeron proposed that witness intimidation might be indicative not of guilt but, rather, of mistrust in the criminal-justice system. *Id.*

**{¶ 19}** In her partial dissent, Judge Kinsley also argued that Evid.R. 404(B) "governs the admissibility of the witness intimidation evidence in this case." *Id.* at ¶ 63 (Kinsley, J., concurring in part and dissenting in part). Grounding her position in the "plain language" of Evid.R. 404(B), she noted that the rule applies broadly to "evidence of '*any* other crime, wrong, or act.' " (Emphasis in original.) *Id.*, quoting Evid.R. 404(B)(1). She further opined that "[b]ecause the trial court paid short shrift to the other wrongful-acts standards in this case, it never reached" the step of balancing the probative value of the evidence against its potential prejudice as required by Evid.R. 403(A). *Id.* at ¶ 84. And she concluded that "weighing the extreme prejudice" of the evidence against its probative value, "the trial court abused its discretion in admitting the letter and the graffiti at trial." *Id.* at ¶ 89. In addition, Judge Kinsley argued that the evidence should not have been admissible because it did not establish the statutorily defined offense of witness intimidation. *Id.* at ¶ 78-80, citing R.C. 2921.04.

**{¶ 20}** Echols appealed to this court. We accepted jurisdiction over his sole proposition of law: "Evidence of witness intimidation that tends to establish consciousness of guilt also constitutes a prior bad act of a defendant; thus it must be admissible under Evid.R. 404(B) and the framework set forth in *State v. Hartman*, as well as being admissible under *State v. Richey*." *See* 2023-Ohio-3670.

## II. Analysis

**{¶ 21}** Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "This type of evidence is commonly referred to as 'propensity evidence' because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question." *Hartman*, 2020-Ohio-4440, at ¶ 21. Evidence of any other crime, wrong, or act, however, may be admitted for a purpose other than showing a person's propensity to commit a crime. Evid.R. 404(B)(2). Such evidence "may

be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

{¶ 22} In *Hartman*, we explained that to properly apply Evid.R. 404(B), courts must determine exactly how such "other-acts" evidence connects to a proper nonpropensity purpose without relying on any intermediate improper-character inferences. *Id.* at ¶ 23. We further explained that "[t]he analysis does not end once a proponent has established a permissible nonpropensity purpose." *Id.* at ¶ 29. Rather, the trial court must also perform the balancing required by Evid.R. 403(A) and determine whether the evidence should be excluded because "its probative value 'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' " *Id.*, quoting Evid.R. 403(A).

{¶ 23} Echols argues that "Evid.R. 404(B) and *Hartman* require that other-acts evidence consisting of actual or attempted witness intimidation be assessed for admissibility under a framework similar to that established in *Hartman*." The State argues that evidence reflective of consciousness of guilt is "fundamentally different" from other-acts evidence and need not be analyzed under *Hartman* or a similar framework. We agree with Echols that the evidence of witness intimidation in this case falls within what Evid.R. 404(B)(1) describes as "[e]vidence of any other crime, wrong, or act." But we find no error in its admission in this case.

### A. Witness-Intimidation Evidence May Constitute Evidence of Another Crime, Wrong, or Act under Evid.R. 404(B)

{¶ 24} The State's argument that witness-intimidation evidence falls outside the scope of Evid.R. 404(B) is refuted by the plain language of the rule. The rule broadly prohibits the use of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). Thus, by Evid.R. 404(B)'s own terms, evidence must meet two criteria to fall within its scope. The evidence must be evidence of a "crime, wrong, or act." Evid.R.

404(B)(1). And it must not be evidence that goes directly to the charged crime itself—rather, it must be evidence of an "*other* crime, wrong or act" (emphasis added), *id.*; *see also* Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events*, § 4.1, at 210-211 (2d Ed. 2019) (generally describing evidence to which Evid.R. 404(B) and its state and federal analogues applies as evidence of "uncharged misconduct").

{¶ 25} Here, there can be no question that Echols's efforts at witness intimidation can fairly be described as a "crime, wrong, or act." *See* Leonard, § 4.6, at 292 (explaining that as a matter of statutory interpretation, the phrase is most naturally read as encompassing acts that are "wrongful in some way" or, to put it differently, "reflect[] negatively on the character of the actor"). And in the context of this case, the evidence meets the "other" requirement. The evidence did not directly show that Echols had committed the shooting. Rather, the State offered the evidence on the theory that Echols had sought to silence witnesses because he was conscious of his own guilt.

{¶ 26} It is true that we have not always been clear that evidence of witness intimidation and other consciousness-of-guilt evidence should be analyzed as other-acts evidence under Evid.R. 404(B). We have sometimes found such evidence admissible without performing an explicit Evid.R. 404(B) analysis. *See, e.g.*, *State v. Richey*, 64 Ohio St.3d 353, 357 (1992), *abrogated in part on other grounds as stated in State v. McGuire*, 1997-Ohio-335. But in other cases, we have made clear that Evid.R. 404(B) applies to this type of evidence. *See, e.g.*, *State v. Tibbetts*, 2001-Ohio-132, ¶ 60 (the defendant's use of an assumed name was admissible under Evid.R. 404(B) because it "was probative of [his] consciousness of guilt," and "[e]vidence used for this purpose is admissible, as it is used for a purpose other than proving a defendant's character"); *State v. Gordon*, 2018-Ohio-259, ¶ 28 (evidence of witness intimidation "would certainly be relevant to show [the defendant's] consciousness of guilt in the robbery case under Evid.R.

404(B)"). We make clear today that witness-intimidation evidence is properly analyzed under Evid.R. 404(B) when it is offered as proof of an "other crime, wrong or act."

### B. The Trial Court Did Not Err in Admitting the Witness-Intimidation Evidence at Echols's Trial

{¶ 27} Our determination that witness-intimidation evidence fits within the scope of Evid.R. 404(B) as evidence of an "other crime, wrong, or act" is only the beginning of our inquiry, however. The more pertinent question is whether the court erred in admitting such evidence at Echols's trial.

{¶ 28} We note at the outset of our review that Echols failed to object to the admission of much of the evidence at issue here. He did not object to the admission of testimony about the gun gesture, and he did not object to the admission of the first two pages of the letter. So we may reverse based on the admission of these items only if we find plain error. *See* Crim.R. 52(B). Echols did, however, object to the admission of the last page of the letter and to the admission of the photograph of the graffiti in his pretrial motions in limine. Though Echols failed to renew his objections during trial, we view as a "definit[e]" ruling the court's announcement on the morning of trial that the letter would be admitted in full, subject to limited redactions, and that the graffiti evidence would be admitted if Bishop testified. *See* Evid.R. 103(A) ("Once the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." [Emphasis added.]). Thus, as to the last page of the letter and the graffiti, our review is under the harmless-error standard. *See* Crim.R. 52(A). Ultimately, though, the distinction is not dispositive here because we find no error, plain or otherwise, in the admission of the witness-intimidation evidence.

#### 1. The Evidence Was Relevant for a Nonpropensity Purpose

{¶ 29} In *Hartman*, we made clear that to be admissible, other-acts evidence (1) had to be relevant for an appropriate purpose other than showing the defendant's

propensity to commit crime, and (2) that (like all evidence) it must satisfy the requirement of Evid.R. 403(A) that its probative value not be "substantially outweighed by the danger of unfair prejudice." 2020-Ohio-4440, at ¶ 20-26, 29. So, we turn now to the question whether the evidence of Echols's efforts at witness-intimidation was relevant for a nonpropensity purpose.

{¶ 30} Evid.R. 404(B) does not contain a blanket prohibition on the introduction of other-acts evidence. Rather, it prohibits the use of such evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). Under the rule, such "evidence may be admissible for another purpose, *such as* proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." (Emphasis added.) Evid.R. 404(B)(2). The determination of whether other-acts evidence is admitted for a permissible purpose is a question of law, which we review de novo. *Hartman* at ¶ 22.

{¶ 31} Though Evid.R. 404(B) lists specific examples of permissible nonpropensity purposes for which other-acts evidence may be admitted, its list is not exhaustive. *State v. Morris*, 2012-Ohio-2407, ¶ 18. To the contrary, the use of the qualifier "such as" makes clear that the examples given in the rule are illustrative, not exclusive. *Id.*; *see also* 1 Broun et al., *McCormick on Evidence*, § 190.1 (8th Ed. 2022) ("evidence of criminal acts may be used in numerous ways, and those enumerated [in the federal analogue to Evid.R. 404(B)] are neither mutually exclusive nor collectively exhaustive").

{¶ 32} Our caselaw establishes that showing consciousness of guilt is a permissible nonpropensity purpose for which evidence of witness intimidation may be admitted. We have held that "[e]vidence of conduct designed to impede or prevent a witness from testifying is admissible as showing consciousness of guilt." *State v. Williams*, 1997-Ohio-407, ¶ 50. In another case, a video of the victim's interview with police was suggestively edited and posted on social media to make

it appear as though he was voluntarily providing information to police about a local gang. *Gordon*, 2018-Ohio-259, at ¶ 28. We found that the defendant's posting the video in an attempt to intimidate the victim from testifying "would certainly be relevant to show [the defendant's] consciousness of guilt." *Id.*; *see also State v. Eaton*, 19 Ohio St.2d 145, 160 (1969), *vacated in part on other grounds sub nom. Eaton v. Ohio*, 408 U.S. 935 (1972), quoting 2 Wigmore, *Evidence*, § 276, at 111 (3d Ed. 1940) ("'It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' "); *Richey*, 64 Ohio St.3d at 357 (the defendant's "threats reflect a consciousness of his guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses").

{¶ 33} Here, the concurring opinion in the court of appeals argued that an attempt to intimidate witnesses does not necessarily reflect a defendant's consciousness of guilt and might simply reflect distrust of the legal system. 2023-Ohio-2206 at ¶ 48-50 (1st Dist.) (Bergeron, J., concurring). But such arguments are better directed to the weight that should be given to such evidence rather than its relevance. Counsel is free to argue to the jury what the concurrence argues below: that an innocent defendant might engage in witness intimidation "because he believes he will be convicted, *regardless of his guilt*" and does "not trust the legal system to accurately sort out innocence from guilt, believing the deck to be unfairly stacked against" him. (Emphasis in original.) *Id.* at ¶ 48. Counsel is also free to argue as part of the balancing required under Evid.R. 403(A) that because of such considerations, the evidence only has limited probative value. But once properly admitted, the weight to be given to evidence of witness intimidation is ultimately a question for the jury.

{¶ 34} Each of the three pieces of evidence at issue here was relevant for a nonpropensity purpose. Bishop's testimony about the gun gesture is in line with

the type of evidence of witness intimidation that we have found relevant to consciousness of guilt in other cases. *See, e.g.*, *Gordon* at ¶ 28; *State v. McKelton*, 2016-Ohio-5735, ¶ 201-202; *State v. Conway*, 2006-Ohio-2815, ¶ 68. The jailhouse graffiti was also relevant to show Echols's consciousness of guilt. And in the letter, Echols attempted to line up witnesses who would present a false alibi for him and also sought to intimidate or silence witnesses. We have held that efforts "to enlist . . . others to falsify evidence and to eliminate or intimidate" witnesses are "highly probative of guilt." *State v. Group*, 2002-Ohio-7247, ¶ 82.

{¶ 35} Echoing Judge Kinsley's partial dissent below, Echols argues that the letter is not relevant to show his consciousness of guilt under Evid.R. 404(B) because it is not evidence of the statutorily defined offense of witness intimidation. *See* R.C. 2921.04. *See* 2023-Ohio-2206 at ¶ 78-80 (1st Dist.) (Kinsley, J., concurring in part and dissenting in part); *see also id*. at ¶ 80 (because Echols did "not himself contact any witnesses or direct communication to witnesses," the letter could not be construed as witness intimidation). But nothing in Evid.R. 404(B) requires that other-acts evidence constitute a crime for it to be relevant. The test for relevance is simply whether evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 36} Echols argues that the graffiti evidence was not relevant because of the possibility that someone else could have written the graffiti and signed Echols's nickname to it. But the likelihood that Echols was the author is strengthened by Bishop's testimony that Echols threatened him with the gun gesture on the same day Bishop saw the graffiti. And while it is possible that someone else could have written the graffiti, a jury could reasonably conclude that the graffiti signed with Echols's nickname and directed at Bishop was likely written by Echols. *See* Evid.R. 104(B); *Hartman*, 2020-Ohio-4440, at ¶ 28, quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988) ("'[s]imilar act evidence is relevant only if the

jury can reasonably conclude that the act occurred and that the defendant was the actor' ").

{¶ 37} Echols also argues that contrary to the court of appeals' lead opinion, the graffiti could not have been "relevant to explain why [Bishop] was initially reluctant to tell the truth and why his story changed over time," 2023-Ohio-2206 at ¶ 31 (lead opinion), because the graffiti postdated Bishop's interviews with police. But regardless of when the graffiti was written relative to Bishop's discussions with the police, the evidence was relevant for the separate purpose of establishing Echols's consciousness of guilt through his efforts to intimidate a witness.

*2. The Trial Court Did Not Abuse Its Discretion in not Excluding the Evidence under Evid.R. 403(A)*

{¶ 38} Our conclusion that the evidence is relevant for a nonpropensity purpose does not end our inquiry. Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A) applies to all evidence, not just Evid.R. 404(B) evidence. In *Hartman*, however, we emphasized the importance of a "robust" Evid.R. 403(A) analysis, *Hartman* at ¶ 29, because other-acts evidence "'almost always carries some risk that the jury will draw the forbidden propensity inference,' " *id.* at ¶ 33, quoting *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) (en banc).

{¶ 39} Our review here is for an abuse of discretion. *Hartman*, 2020-Ohio-4440, at ¶ 30. This is because "[w]eighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis" and "[b]alancing the risks and benefits of the evidence necessarily involves an exercise of judgment." *Id.* "We have defined an abuse of discretion as conduct that is unreasonable, arbitrary or unconscionable." *State v. Beasley*, 2018-Ohio-16, ¶ 12.

**{¶ 40}** Here, the trial court did not explicitly perform the Evid.R. 403(A) balancing on the record at the time that it ruled on the admission of the two pieces of witness-intimidation evidence to which Echols had objected. The better practice would have been for it to do so. *See* Leonard, § 4.5.2, at 286-289. Nevertheless, our review is directed at the ultimate admission of the evidence itself. And we find no abuse of discretion in the trial court's decision to admit the disputed evidence.

**{¶ 41}** The evidence of Echols's efforts at witness intimidation was highly prejudicial. But as we've stated before, "it is fair to say that all relevant evidence is prejudicial." *State v. Crotts*, 2004-Ohio-6550, ¶ 23. Accordingly, the Rules of Evidence do not bar all prejudicial evidence, but only that which is "*unfairly prejudicial*." (Emphasis in original.) *Id.* The phrase "unfairly prejudicial" "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Thus, in the context of Evid.R. 404(B) evidence, the primary concern is that the evidence creates an undue tendency to lead the factfinder to find guilt based on an impermissible character-based inference.

**{¶ 42}** The Evid.R. 403(A) balancing requires the court to engage in the "highly fact-specific and context-driven analysis" of weighing the probative value of the other-acts evidence against the danger of unfair prejudice. *Hartman*, 2020-Ohio-4440, at ¶ 30. In assessing the probative value of other-acts evidence, a court should consider, among other things, whether the evidence goes to an issue that is "actually in dispute," the extent to which the evidence is "material to the case," and the extent to which the State is able to "prove the same fact[s] through less prejudicial means." *Id*. at ¶ 31-32.

**{¶ 43}** On the prejudice side of the scale, "probably the most important [factor] is the similarity of the uncharged misconduct to the conduct at issue in the case." Leonard, § 4.5.1, at 273. "The greater the similarity between the charged

and uncharged acts, the greater the likelihood the jury will employ the forbidden character reasoning or even convict based on the uncharged rather than the charged conduct." *Id*. at 274. Thus, a jury is much more likely to reach a nonpermissible, character-based inference that a defendant committed murder from evidence that the defendant committed other murders than it is to improperly infer that a defendant committed murder because he previously stole a car.

{¶ 44} Here, the evidence of Echols's efforts at witness intimidation had significant materiality to the State's case. The State recognized the importance of the evidence and emphasized the graffiti, gun gesture, and letter in its closing argument, stating that far from the "act of a desperate kid," these pieces of evidence reflected Echols's consciousness of his own guilt. The evidence went to a fact that was in dispute, and there was no less prejudicial way to show witness intimidation than admitting the evidence itself. Further, any danger of unfair prejudice was lessened because of the lack of similarity between the acts with which Echols was charged and his efforts at witness intimidation.

{¶ 45} The evidence may have been prejudicial, but not unfairly so. We conclude that the trial court did not abuse its discretion in admitting this evidence.

### C. The Trial Court Did Not Commit Plain Error in Failing to Issue a Limiting Instruction

{¶ 46} In *Hartman*, we explained that "[w]hen a court determines that other-acts evidence should be admitted, it must take steps to minimize the danger of unfair prejudice inherent in the use of such evidence and to ensure that the evidence is considered only for a proper purpose." 2020-Ohio-4440 at ¶ 34. We advised that, upon request, a trial court must issue a limiting instruction at the time that the evidence is introduced that is specifically "tailored to the facts of the case" and that explains the limited "purposes for which the other acts may and may not be considered." *Id*. at ¶ 67, 70. We also explained that in its final instructions to the jury, the court should provide an instruction that explains in plain language the

limited purposes for which the evidence may be used. *Id.* at ¶ 70-71. The instruction should be tailored to the facts of the case and the specific purpose for which the evidence has been admitted rather than a boilerplate recitation of all the permissible uses of such evidence set forth in Evid.R. 404(B). Here, Echols argues that "the absence of any limiting jury instructions whatsoever requires reversal."

**{¶ 47}** We reiterate today the importance of a carefully tailored limiting instruction on the proper use of other-acts evidence. But the problem for Echols is that he did not ask for a limiting instruction at the time the evidence was introduced, and he did not object to the trial court's final jury instructions. Although a court must give a limiting instruction upon request, this "does not mean the court should sua sponte issue such an instruction any time other-acts evidence is used." *Id*. at ¶ 67. Indeed, "[d]epending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury." *Id*. When counsel fails to request a limiting instruction or object to the court's jury instructions, our review is for plain error. *Id.* at ¶ 72.

**{¶ 48}** Here, Echols failed to request a limiting instruction for the testimony regarding the graffiti or gun gesture. As to the letter, Echols did not request a limiting instruction in his written motion in limine. During the pretrial hearing on the motion, however, his counsel orally requested that if the court found the final page admissible, it "craft a very specific jury instruction as to why the jury is considering" that portion of his letter. The court did not address this request for a limiting instruction at the hearing, and Echols did not follow up on this request after the court ruled that the evidence would be admitted. Echols did not renew his request for a limiting instruction at trial, and when Echols later made a motion for specific jury instructions, he did not request an instruction related to the letter. Nor did Echols object to the final jury instructions given by the court.

{¶ 49} We find that Echols forfeited his right to a limiting instruction regarding the letter when he failed to renew the request he made at the pretrial hearing. Evid.R. 105 provides that "[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, *upon request of a party*, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) Crim.R. 30(A) further instructs that "on appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."

{¶ 50} Because Echols failed to request a limiting instruction during trial or before the case was submitted to the jury and did not object to the final jury instructions, he can prevail only by showing plain error. Echols must demonstrate that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. *State v. Knuff*, 2024-Ohio-902, ¶ 117. Plain error should be noticed only "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Clayton*, 62 Ohio St.2d 45, 47 (1980), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "The burden of demonstrating plain error is on the party asserting it." *State v. Payne*, 2007-Ohio-4642, ¶ 17.

{¶ 51} Here, Echols has failed to establish plain error. First, we are not convinced that the trial court erred in failing to provide an instruction that Echols did not ask for at trial. As we explained in *Hartman*, the failure to request an instruction at trial may well be a tactical choice to avoid further highlighting the evidence to the jury. *See Hartman*, 2020-Ohio-4440, at ¶ 67.

{¶ 52} Moreover, even if we were convinced that a limiting instruction should have been given, Echols has failed to demonstrate prejudice. There was ample testimony that Echols was one of the shooters. And this evidence was

corroborated by GPS data from Echols's phone, text messages, and evidence from social media.  Thus, Echols has failed to show that the outcome of his trial "clearly would have been otherwise" but for the trial court's failure to give the jury a limiting instruction regarding the evidence of witness intimidation.

### III.  Conclusion

{¶ 53} The trial court did not err in admitting the evidence of other crimes, wrongs, or acts at issue in this case.  Nor did the trial court commit plain error in failing to provide an instruction to the jury on the limited purposes for which such evidence could be considered.  We affirm the judgment of the First District Court of Appeals.

Judgment affirmed.

_____

Melissa A. Powers, Hamilton County Prosecuting Attorney, and Philip R. Cummings and Judith Anton Lapp, Assistant Prosecuting Attorneys.

Elizabeth Miller, Ohio Public Defender, and Craig M. Jaquith, Assistant Public Defender, for appellant.

_____